## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DEVAN BREMBRY,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:10cv00388 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **UNITED STATES OF AMERICA,** | ) | |
| **et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants. | ) | United States Magistrate Judge |

Plaintiff, Devan Brembry, an inmate formerly incarcerated at United States Penitentiary Lee County, ("USP Lee"), in Jonesville, Virginia,[1] filed this action pro se for monetary damages, as well as declaratory and injunctive relief, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971),[2] and the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., ("FTCA"), against the United States of America and two employees of the Federal Bureau of Prisons, ("BOP"),[3] asserting claims against them related to an assault he suffered at the hands of three other inmates, as well as with respect to the medical attention that he subsequently received from prison medical personnel. Jurisdiction over this matter is based upon 28 U.S.C. § 1331. This case is before the undersigned

---

[1] Brembry is currently housed at Federal Correctional Complex Coleman – II USP, in Coleman, Florida.

[2] *Bivens* allows an individual to bring an action for damages against federal officers, acting under color of federal law for a violation of Fourth Amendment rights. It is the federal counterpart to a 42 U.S.C. § 1983 claim. As Judge Conrad noted previously in this case, these claims are more properly brought pursuant to *Carlson v. Green*, 446 U.S. 14 (1980), which extended *Bivens* to recognize an implied damages action against federal prison officials for violation of the Eighth Amendment. *See Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006).

[3] The named defendants are United States of America; S. Tignor, a corrections officer at USP Lee; and Chris Bartee, a nurse in the USP Lee infirmary.

-1-

magistrate judge by transfer based on the consent of the parties pursuant to 28 U.S.C. § 636(b)(1)(A).

The defendants filed a previous Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment, (Docket Item No. 15.)[4] Thereafter, Brembry filed a cross-motion for summary judgment. (Docket Item No. 18.) By Order entered January 13, 2011, the Honorable Glen E. Conrad, Chief United States District Judge, granted the defendants' prior motion in part and denied it in part, and he denied Brembry's cross-motion in its entirety. (Docket Item No. 22.) Specifically, the court dismissed each of Brembry's claims against the defendants except (1) his claim against the United States under the FTCA, which alleges that Officer Tignor negligently failed to protect him; and (2) Brembry's *Bivens* claim against Officer Tignor alleging the same. Thereafter, on July 15, 2011, the remaining defendants, United States of America and Officer Tignor, filed a Motion For Summary Judgment, seeking dismissal of Brembry's remaining *Bivens* and FTCA claims as a matter of law. (Docket Item No. 65) ("Motion"). Brembry responded to the Motion on July 28, 2011, (Docket Item No. 87), and the defendants filed their reply on August 8, 2011. (Docket Item No. 92.) Based on the arguments contained in the parties' briefs and the accompanying affidavits and exhibits, I will deny the Motion.

---

[4] This previous motion was treated as a motion for summary judgment.

## I.    Facts and Analysis

Brembry was an inmate incarcerated at USP Lee during all times relevant to this action. At approximately 10:30 a.m. on December 3, 2009, Officer Shannon Tignor, who was serving as the day shift officer in charge of Brembry's housing unit, ("E-Unit"), announced a prisoner "controlled move," which required all prisoners to return to their assigned housing units prior to the noon meal. After Officer Tignor unlocked and opened the inner door to the sallyport area of E-Unit, he stepped approximately eight feet outside of E-Unit while the inmates began returning to their assigned housing units. As Brembry entered the sallyport, three inmates assigned to other housing units began punching and kicking him. Brembry called for Officer Tignor to help, but he did not respond. Brembry was able to break free from his attackers and retrieved a mop handle from a nearby closet with which to defend himself. Brembry's attackers then proceeded upstairs to Brembry's assigned cell and waited for him to return. Brembry again called for Officer Tignor's assistance, but he still did not respond. When Brembry went to his cell and saw the inmates waiting for him there, he reached inside and pressed the duress alarm, after which his attackers began to assault him again. It was during this second assault that Brembry was struck with a metal object and received a gash in his forehead.

Officer Tignor, who was still positioned outside of the E-Unit, heard the alarm and then yelling from the top range of E-Unit. When he looked up toward Brembry's cell, he saw Brembry stabbing at three other inmates with a broken mop handle. Officer Tignor radioed for help, and multiple officers soon arrived on the scene and subdued each of the inmates. As he was being led away in hand

restraints, Brembry twisted free from the officer who was escorting him and kicked one of his attackers, who also was restrained, in the groin, also striking an officer's lower leg in the process. Brembry was confined to the Special Housing Unit, ("SHU"), and he lost 27 days of good conduct time, as well as 120 days of commissary privileges.  A transfer to another institution also was recommended.

As a result of the assault, Brembry required five surgical staples to close the wound to his forehead. One of these staples later had to be removed and was replaced with a steri-strip and surgical glue.

USP Lee employees work within a framework of various post orders. Special Post Orders for General Housing Units A Thru L states, in relevant part, as follows:

> The Unit Officer will remain inside the inner door of the Unit during controlled movements.  This will deter any prohibited acts being committed while the movements are in progress.

(Att. 4 to Docket Item No. 66 at 1.) According to David Wilson, Captain at USP Lee during all relevant times to this case, one of the responsibilities of correctional officers assigned to housing units is to monitor "controlled moves." (Att. 1 to Docket Item No. 66, ("Wilson Declaration"), at 2.) These are times when inmates are allowed to move from one area of the prison to another within a set period. (Wilson Declaration at 2.) In December 2009, a controlled move would take place from approximately 10:30 a.m. to 10:50 a.m. when inmates returned to their housing units from morning activities ("the Morning Controlled Move"). (Wilson Declaration at 2.) This move is in preparation for the lunch meal. (Wilson

-4-

Declaration at 2.) During the Morning Controlled Move, an officer from each housing unit is responsible for monitoring the area around the entrance of his unit. (Wilson Declaration at 2.) The main responsibility of these officers is to deter prohibited activity such as fighting, possession of contraband and inmates accessing unauthorized areas. (Wilson Declaration at 2.) Wilson testified that the officers are not expected to focus their attention exclusively on the housing unit entrance during this time. (Wilson Declaration at 2.)

According to the Captain's Post Order Review Sheet:

"[p]ost orders are issued as guidelines for the officers assigned to this post and are not intended to describe in detail all of the duties assigned to this post.  Officers assigned to this post are expected to use their initiative and good judg[]ment in all situations covered in these post orders. If any questions should arise in policy and procedures pertaining to this post, consult the appropriate Program Statement, Institution Supplement, Specific Instructions or your supervisor."

(Att. 7 to Docket Item No. 66.) Wilson testified that he is aware that the post orders in effect in December 2009 suggest that officers should remain inside the inner door of housing units during controlled moves. (Wilson Declaration at 2-3.) However, he testified that post orders are advisory documents that provide correctional officers with guidance on their responsibilities. (Wilson Declaration at 2.) He stated that specific post orders provide guidance organized by shift designation, time frame and topic, while special instructions post orders set forth a basic "how to" for duties and security inspections for each shift and at a particular post. (Wilson Declaration at 2.) Wilson stated that in certain situations, officers are

expected to deviate from written post orders, such as when necessary to maintain security within the institution, noting that an officer is expected to use his experience and judgment in deciding whether deviating from post orders is necessary. (Wilson Declaration at 2.) Wilson testified that during inmate movements, correctional officers are expected to position themselves in a manner that best deters prohibited activity. (Wilson Declaration at 3.)  Wilson testified that, based on his correctional experience, the inner door of housing units is not more dangerous during the Morning Controlled Move than other areas of the prison. (Wilson Declaration at 3.)

Officer Tignor submitted a declaration, in which he stated that, during controlled moves, he would typically go back and forth between the inside and outside of E-Unit. (Att. 5 to Docket Item No. 66, ("Tignor Declaration"), at 2.)  He stated that he always remained close to the entrance, generally within about 15 feet. (Tignor Declaration at 2.) Officer Tignor stated that he positioned himself differently from day to day to avoid establishing a predictable pattern. (Tignor Declaration at 2.) Officer Tignor further stated that officers are not expected to focus their attention exclusively on the housing unit entrance during this time. (Tignor Declaration at 2.) He testified that he believed the post orders in effect in December 2009 to intend that officers remain near the housing unit entrance during controlled moves. (Tignor Declaration at 2.)  He stated that he understood that the post orders were only guidance and were not binding. (Tignor Declaration at 2.) Officer Tignor stated that he was never instructed to remain inside the housing unit for the entire duration of a controlled move. (Tignor Declaration at 2.)

William Faulk, a Senior Officer at USP Lee, also submitted a declaration, stating that when working as a housing unit officer during inmate movements, he typically goes back and forth between the inside and outside of the housing unit when monitoring controlled moves. (Att. 8 to Docket Item No. 66, ("Faulk Declaration"), at 1.) Faulk stated that in his experience, the inner door area of the housing unit is not more dangerous during the Morning Controlled Move than the courtyard, particularly since most of the inmates are in the yard. (Faulk Declaration at 1.) Faulk further stated that he understood the post orders to intend that officers remain near the housing unit entrance during controlled moves. (Faulk Declaration at 1-2.) Faulk further stated that he has never been specifically instructed to remain inside the inner doorway of the housing units when controlled moves are in progress. (Faulk Declaration at 2.)

The administrative remedy procedure, through which an inmate in federal custody may seek a formal review of an issue or complaint relating to his confinement, is set forth at 28 C.F.R. § 542.10 et seq. (2011). First, an inmate must present an issue of concern for informal resolution at the institutional level. *See* 28 C.F.R. § 542.13(a) (2011). If an inmate is unable to resolve his complaint informally, he may file a formal written complaint to the Warden on the proper form, the BP-9, within 20 calendar days of the date of the occurrence on which the complaint is based. *See* 28 C.F.R. § 542.14(a) (2011). The regulations do not contain any deadline for the Warden's response to the formal written complaint. If an inmate is not satisfied with the Warden's response, he may appeal, using the appropriate BP-10 form, to the Regional Director within 20 days of the Warden's response. *See* 28 C.F.R. § 542.15(a) (2011). If the inmate still is not satisfied, he may appeal the Regional Director's response to the Office of General Counsel

using the appropriate BP-11 form.  *See* 28 C.F.R. § 542.15(a). The inmate must file this appeal within 30 calendar days of the date the Regional Director signed the response.  *See* 28 C.F.R. § 542.15(a). An inmate is not deemed to have exhausted his administrative remedies until he has filed a complaint at all levels of review. *See* 28 C.F.R. § 542.15(a).

Brembry filed an administrative tort claim with the BOP on March 10, 2010, alleging negligence by BOP staff for failure to protect him from the assault. (Att. 17 to Docket Item No. 66.)  However, by letter dated April 8, 2010, the BOP denied the claim. (Att. 18 to Docket Item No. 66.) Brembry has stated that he attempted to grieve these issues through his Unit Team, Counselor Hicks, Case Manager Olstein and Unit Manager Friss informally by explaining the situation to them. (Att. to Docket Item No. 18, ("Brembry Declaration"), at 3-4.) Brembry also claims that he attempted to file several formal written complaints at the institutional level by delivering his complaints to the officers working the SHU. (Brembry Declaration at 4.) Brembry states when he never received any response from the Warden to his complaints, he proceeded to the next level in the administrative process. (Brembry Declaration at 4.)

The defendants have submitted an affidavit from Michael Hicks, the Correctional Counselor in the E-unit where Brembry was housed on December 3, 2009. (Att. 15 to Docket Item No. 66, ("Hicks Declaration")). Hicks testified that, as a Correctional Counselor, one of his duties was to distribute administrative remedy forms to inmates in his unit. (Hicks Declaration at 1.) He further testified that, although the Correctional Counselors were primarily responsible for such distribution, other Unit Team members also could provide those forms to inmates.

(Hicks Declaration at 1.) In his declaration, Hicks outlined the administrative remedy process at USP Lee. (Hicks Declaration at 1-2.) Specifically, Hicks testified that inmates must first present the issue informally to staff before they begin the administrative remedy process by utilizing a form commonly referred to as an "8.5" or "8 ½." (Hicks Declaration at 1.) Hicks explained that if an inmate is dissatisfied with the response at the informal resolution stage, he may then request a BP-9 form from his Counselor to begin the administrative remedy process. (Hicks Declaration at 2.)  Hicks stated that he was responsible for monitoring and maintaining a logbook on the 8.5 stage and the BP-9 stage. (Hicks Declaration at 2.) He stated that when he distributed 8.5s and BP-9s to inmates, he kept copies of the inmate's completed form when it was returned to him, and he also kept copies of the response that was provided to the inmate. (Hicks Declaration at 2.) Hicks testified that after checking such records from 2005 through March 2010, no 8.5s or BP-9s from inmate Brembry were found. (Hicks Declaration at 2.) Hicks testified the he also reviewed records of Brembry's administrative remedy history and found that he filed several administrative remedies at the Regional (BP-10) and Central Office levels (BP-11) during the relevant time period. (Hicks Declaration at 2.) Hicks stated that Brembry would have obtained administrative remedy forms, including BP-10s and BP-11s, from either him or another member of the Unit Team, even during the time he was housed in the SHU. (Hicks Declaration at 2.) Hicks testified that Unit Team staff members make daily rounds in the SHU, addressing issues with inmates from their respective units and distributing forms when needed. (Hicks Declaration at 2.) Finally, Hicks testified that he had never destroyed an inmate's remedy request instead of processing it, nor had he deliberately refused to process an inmate's administrative remedy request. (Hicks Declaration at 2.)

The defendants also have submitted an affidavit from Sharon Wahl, the paralegal for the Consolidated Legal Center at the Federal Correctional Institution, ("FCI"), Beckley, West Virginia, ("Legal Center"). (Att. 16 to Docket Item No. 66, ("Wahl Declaration")). Wahl testified that the Legal Center oversees legal matters arising at various BOP institutions, including USP Lee. (Wahl Declaration at 1.) She further testified that as a paralegal for the Legal Center, she had access to SENTRY, the Federal BOP's online inmate information system, which tracks, among other things, administrative remedy data. (Wahl Declaration at 1.) Wahl stated that she also had access to inmate central files, medical and psychiatric records of BOP inmates, and Content Manager, the administrative tort claim tracking system. (Wahl Declaration at 1.) She testified that Brembry filed an administrative tort claim with the Federal BOP on March 10, 2010, alleging negligence by BOP staff for failure to protect him from the assault. (Wahl Declaration at 1.) By letter dated April 8, 2010, the BOP denied the claim. (Wahl Declaration at 2.)

Through a review of SENTRY records, Wahl identified six administrative remedies relevant to this case filed by Brembry. (Wahl Declaration at 2.) Wahl testified that Brembry filed a remedy, # 574299-R1, at the Regional Office level on January 26, 2010, requesting a transfer due to the assault. (Wahl Declaration at 2.) The remedy request was rejected the same day because it was not submitted on the proper form and because Brembry did not provide a copy of the institutional level remedy. (Wahl Declaration at 2.) She testified that Brembry refiled the remedy request at the Regional level, # 574299-R2, on February 4, 2010, where it was again rejected on February 16, 2010, for failure to provide a copy of the BP-9. (Wahl Declaration at 2.) Brembry then attempted to appeal the rejection to the

Central Office level, # 574299-A1, on March 3, 2010, but it was rejected on April 2, 2010, for being submitted at the wrong level. (Wahl Declaration at 2.) Thereafter, on September 30, 2010, Brembry refiled the remedy request at the Regional level, # 574299-R3, but it was rejected on October 1, 2010, for being submitted at the wrong level and for failure to file a BP-9 at the institutional level. (Wahl Declaration at 2.)

Additionally, Wahl testified that on March 17, 2010, Brembry appealed to the Regional Office level the disciplinary action filed against him in connection with the incident report he received on December 3, 2009, for assault. (Wahl Declaration at 2.) This was designated as remedy request 581928-R1. (Wahl Declaration at 2.) This remedy request was denied on May 24, 2010.[5] (Wahl Declaration at 2.) The Regional Office found that the disciplinary procedures were substantially followed, that the evidence supported the DHO's finding and that the sanctions were appropriate for the offense. (Wahl Declaration at 3.) Thereafter, Brembry appealed this response to the Central Office level, # 581928-A1, but was denied on March 14, 2011. (Wahl Declaration at 3.) While it appears that this issue was exhausted, I agree with the defendants that it makes no mention of any staff member who allegedly failed to protect Brembry from the December 3, 2009, assault. Instead, it simply seeks expungement of Brembry's discipline for his actions connected therewith. (Att. D to Wahl Declaration.) Thus, I find that, while this issue of expungement was exhausted, it is not relevant to the issue of Tignor's alleged failure to protect.  That leaves only remedy request # 574299.

---

[5] Wahl testified that the Disciplinary Hearing Officer's, ("DHO"), appeals are filed directly to the Regional Office level instead of the institutional level.  (Wahl Declaration at 3.)

### A.   Motion for Summary Judgment

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a);  see, e.g., *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. Thus, the court will view the facts and inferences in the light most favorable to Brembry on the defendants' motion for summary judgment. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

### 1.   Claims Under the FTCA

The FTCA states, in relevant part, as follows:

> the district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, … for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance of the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346(b)(1) (West 2006). Thus, the FTCA operates as a waiver of the United States' sovereign immunity for certain tort actions. *See United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). If the plaintiff does not comply with the FTCA exhaustion requirements or if the conduct of the government actors at issue falls within one of the statutory exceptions to the FTCA, sovereign immunity is not waived with respect to the plaintiff's claim, and the court lacks subject matter jurisdiction to hear it. *See* 28 U.S.C.A. §§ 1346 and 2674-2860; *Varig Airlines*, 467 U.S. at 808; *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998). Brembry has conceded that the United States is the only proper defendant in a suit under the FTCA. *See* 28 U.S.C.A. § 2679(b) (West 2006); *Iodice v. United States*, 289 F.3d 270, 273 n.1 (4th Cir. 2002); *Allgeier v. United States*, 909 F.2d 869, 871 (6th Cir. 1990). I first find that Brembry's FTCA claim has been exhausted because he filed an administrative tort claim with the BOP on March 10, 2010, and received a denial letter on April 8, 2010. This claim also was filed within the appropriate two-year statute of limitations period.

As noted above, the only remaining FTCA claim is the failure to protect claim alleging that Officer Tignor was negligent in failing to remain inside the

housing unit during the controlled inmate movement. Specifically, Brembry claims that Officer Tignor's post orders required him to remain inside the unit during any controlled inmate movement, that he failed to do so, and that this failure proximately caused Brembry's resulting injuries and disciplinary sanctions. Judge Conrad found previously that the discretionary function exception did not apply to the facts of this case given the existence of post orders regarding controlled movements. However, the defendants again assert the discretionary function exception in the Motion currently before the court. For all of the reasons set forth in Judge Conrad's Memorandum Opinion, I also find that the discretionary function exception does not apply to the facts of this case.

In FTCA actions, federal courts apply the substantive law of the state in which the act or omission giving rise to the action occurred. *See Myrick v. United States*, 723 F.2d 1158, 1159 (4th Cir. 1983); *see also* 28 U.S.C. § 1346(b)(1). In Virginia, the essential elements of a negligence claim are: "(1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." *Talley v. Danek Med., Inc.*, 179 F.3d 154, 157 (4th Cir. 1999). The burden is on the plaintiff to prove these elements by a preponderance of the evidence. *See Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000). Essentially, the plaintiff must prove that the "defendant's breach of duty was more likely than not (i.e., probably) the cause of injury." *Murray*, 215 F.3d at 463 (quoting *Hurley v. United States*, 923 F.2d 1091, 1094 (4th Cir. 1991)). In Virginia, the standard of conduct to which a party must conform to avoid being negligent is that of a reasonable person under like circumstances. *See Talley*, 179 F.3d at 157-58.

The defendants argue that Brembry's FTCA claim fails because he cannot establish (1) that Officer Tignor breached his duty of care; or (2) that his injuries were proximately caused by Officer Tignor's actions. Title 18 U.S.C. § 4042 establishes the duty of care owed to a prisoner as, "the exercise of ordinary diligence to keep prisoners safe and free from harm." *See Jones v. United States*, 534 F.2d 53, 54 (5th Cir. 1976). The defendants argue that prison officials have discretion as to the manner and means of fulfilling this duty. While this may generally be the case, here, there is a post order containing language of a mandatory nature that unit officers "will remain inside the inner door of the Unit during controlled movements." While former Captain Wilson has submitted a declaration stating that post orders are meant to provide "flexible guidance" to USP Lee staff, I find that such a notion contradicts the mandatory language of the post order at issue. Thus, there is a genuine dispute in fact as to whether the post order is of a mandatory nature. If following the post order is mandatory, failure to do so may be negligence per se. *See Talley*, 179 F.3d at 158 ("Under the doctrine of negligence per se … the violation of a statute or ordinance can constitute a violation of the 'reasonable man' standard as a matter of law…. Thus, in negligence per se cases, the courts 'adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation.") (citing *Butler v. Frieden*, 158 S.E.2d 121, 122 (Va. 1967) and RESTATEMENT (SECOND) OF TORTS § 286 (1965)). Furthermore, even if the post order is not mandatory, failing to abide by it may be negligent. *See Tally*, 179 F.3d at 158 (what is negligent is generally determined by the fact finder on a case-by-case basis). Therefore, I will not rule as a matter of law that Officer Tignor did not breach the applicable duty of care.

I also do not find it appropriate to rule as a matter of law that Officer Tignor's actions did not proximately cause Brembry's injuries. "Proximate causation refers to closeness or nearness in causal connection; it is the cause that produces the injury and without which the injury could not have happened. *Koutsounadis v. England*, 380 S.E.2d 644, 646 (Va. 1989) (citation omitted). Proximate cause exists only where there is a natural and unbroken connection between the alleged negligence of the defendant and the injury suffered by the plaintiff. *See Koutsounadis*, 380 S.E.2d at 646. Under Virginia law, the issues of negligence and proximate causation are generally questions of fact that are left for a jury to decide. *See Kellermann v. McDonough*, 684 S.E.2d 786, 793 (Va. 2009) (citing *Moses v. SW. Va. Transit Mgmt. Co.*, 643 S.E.2d 156, 160 (Va. 2007), *Jenkins v. Payne*, 465 S.E.2d 795, 799 (Va. 1996), *Brown v. Koulizakis*, 331 S.E.2d 440, 445 (Va. 1985), and *Armstrong v. Rose*, 196 S.E. 613, 616 (Va. 1938)). The issue of proximate causation only becomes a question of law when viewing the evidence, reasonable minds cannot differ as to the result. *See Scott v. Simms*, 51 S.E.2d 250, 253 (Va. 1949) (citation omitted); *see also Edgerton v. Norfolk S. Bus Corp.*, 47 S.E.2d 409, 415 (Va. 1948) ("whether there is a causal connection between a defendant's negligence and a plaintiff's injuries is usually a question for the jury. It is only when men of reasonable minds may not fairly differ on the proper inferences to be drawn from the facts proved that is becomes a question of law for the court.").

I find that reasonable minds could differ as to whether Officer Tignor's failure to place himself in the inside of the E-Unit door during the controlled move on December 3, 2009, proximately caused Brembry's injuries. Specifically, I find that reasonable minds could find that had Officer Tignor abided by the post order

and remained stationed inside the E-Unit door, the three inmates would not have commenced the attack on Brembry inside the sallyport area, and Brembry would not have suffered the injuries he sustained. On the other hand, I find that reasonable minds also could find that, even if Officer Tignor were stationed inside the E-Unit door during the controlled move, the attack, nonetheless, might have occurred there, given the sealed testimony of one of the inmates involved in the assault that Brembry precipitated the attack by using confrontational language and gestures. I also note the defendants' potential argument that Brembry's action of retrieving the broken mop handle and following the other inmates to his cell, where he received his main injury, constituted a superseding event that broke the chain of causation so that Officer Tignor's actions would not be deemed to have proximately caused Brembry's injuries. It is for all of these reasons that I find that reasonable minds could differ as to whether Officer Tignor's failure to abide by the post order proximately resulted in Brembry's injuries.

It is for all of the reasons cited above that I will deny the defendants' Motion as it pertains to Brembry's FTCA negligence claim.

## 2. *Bivens Claim*

Brembry also brings a claim against Officer Tignor pursuant to *Bivens*, 403 U.S. 388 as extended by *Carlson*, 446 U.S. 14. In their brief, the defendants argue that Brembry's *Bivens* claim must be dismissed for failure to exhaust his administrative remedies. I disagree. The Prison Litigation Reform Act, ("PLRA"), Pub. L. No. 104-134, amended 42 U.S.C. § 1997e making it mandatory that a

prison inmate exhaust his administrative remedies before filing a civil rights suit based on prison conditions.  This section states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a) (West 2003). This court previously has held that the exhaustion requirement of the PLRA applies to inmates seeking monetary damages, although such damages are not available through a prison grievance system. *See Osbourne v. Deeds*, Civil Action No. 7:99cv00774 (W.D. Va. Jan. 24, 2001). The United States Supreme Court also has addressed this issue, holding that under the PLRA, a particular remedy need not be available through the prison's administrative process in order for the PLRA exhaustion requirement to apply. *See Booth v. Churner*, 532 U.S. 731 (2001). "[A] prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing a suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). As exhaustion is an affirmative defense, it is the defendants who bear the burden of proving that Brembry failed to administratively exhaust his claims. *See Jones v. Bock*, 549 U.S. 199, 212 (2007); *see also Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 681 (4th Cir. 2005). Thus, summary judgment will be granted on the ground of failure to exhaust only if the defendants can "show that the evidence is so one-sided that no reasonable factfinder could find that [Brembry] was prevented from exhausting his administrative remedies." *Hill v. O'Brien*, 387 F. App'x 396, 399 (4th Cir. July 12, 2010) (unpublished) (reversing an award of summary judgment against a prisoner

who claimed that prison officials had hindered his ability to file administrative grievances). It is well-established that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

As stated previously, in order for a federal inmate to properly exhaust his claims, he must first present an issue of concern informally at the institutional level. *See* 28 C.F.R. § 542.13(a). If the inmate's complaint is not, thereby, resolved, he must file a written formal complaint on the proper BP-9 form at the institutional level. *See* 28 C.F.R. § 542.14. Then, he must appeal any adverse decision first to the Regional Office, using the appropriate BP-10 form, and then to the Bureau of Prisons' Office of General Counsel, using the appropriate BP-11 form. *See* 28 C.F.R. § 542.15. The defendants argue that, according to the BOP's records, Brembry never submitted any complaints at the institutional level. Instead, they argue that the records show that Brembry started the process at the Regional Office level without ever filing anything at the institutional level. Brembry does not allege that he was unaware of the appropriate administrative remedy procedure. Instead, he claims that he attempted to file several complaints at the institutional level prior to filing at the Regional Office level, but because he had been transferred to the SHU, he had to rely on the prison guards to deliver his completed forms.

Brembry also does not dispute that he did not file a BP-8.5 for informal resolution at the institutional level before proceeding to the formal BP-9 at the institutional level. According to 28 C.F.R. § 542.13(a), "[e]xcept as provided in § 542.13(b), an inmate shall first present an issue of concern informally to staff, and

staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." I note, however, that 28 C.F.R. § 542.13(a) does not require a *written* submission.  It further states that "Each Warden shall establish procedures to allow for the informal resolution of inmate complaints."  28 C.F.R. § 542.13(a). Here, no evidence of the specific procedures for informal resolution, as promulgated by the Warden at USP Lee, has been provided in this case.  While Hicks testified that "an inmate is provided a form commonly referred to as an '8.5' or '8 ½' for the informal resolution stage," he did not testify that an inmate's informal remedy must be submitted on such a form. (Hicks Declaration at 1.) Thus, there is a genuine dispute in fact as to whether Brembry exhausted his administrative remedies. Therefore, entry of summary judgment on this basis would be inappropriate.

I now turn to Brembry's *Bivens* claim. Specifically, Brembry alleges that Officer Tignor failed to protect him from an assault by fellow inmates in violation of the Eighth Amendment. In order to succeed on such a claim, Brembry must sufficiently show that Officer Tignor was deliberately indifferent to a serious risk to Brembry's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).  To be deliberately indifferent, a prison official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Here, Officer Tignor's post orders as written required him to "remain inside the inner door of the Unit during controlled movements." (Att. 4 to Docket Item No. 66). The rationale offered in the post order for this specific requirement was that this particular positioning of officers "will deter any prohibited acts being committed while the movements are in progress."  (Att. 4 to Docket Item No. 66). The defendants have provided declarations from Wilson, Tignor and Faulk, in

which they state that, in their experience, the inner door area of a housing unit is not more dangerous than any other area. Nonetheless, this evidence only creates an issue of fact. Based on the mandatory language of the post order and the rationale contained in the order, a jury could find that Officer Tignor deliberately ignored a specific excessive risk of attack on Brembry. That being the case, I further find that summary judgment is inappropriate on Brembry's *Bivens* claim that Officer Tignor violated his Eighth Amendment right by failing to protect him from the assault by the other inmates when he failed to remain inside the unit door during the controlled move on December 3, 2009.

### a.   *Qualified Immunity*

The defendants also argue that Officer Tignor is entitled to qualified immunity on Brembry's *Bivens* claim.  Qualified immunity "shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Short v. Smoot*, 436 F.3d 422, 426 (4th Cir. 2006) ("Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The defense of qualified immunity is available only when a government official is performing a discretionary function. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Collinson v. Gott*, 895 F.2d 994, 997 n.1 (4th Cir. 1990). However, for the reasons already stated herein, I find that there is a genuine issue of material fact as to whether Officer Tignor was performing a discretionary

function when he chose to stand outside of the E-Unit door during the controlled move. Therefore, I find summary judgment based on qualified immunity inappropriate at this time.

Although Brembry's FTCA claim must be tried to the court without a jury, *see* 28 U.S.C. § 2402, the court notes that on April 28, 2011, Brembry made a demand for a jury trial with respect to his *Bivens* claim. The case is currently set for jury trial on October 17-18, 2011, beginning at 9:00 a.m, before the undersigned, in the United States District Court in Big Stone Gap, Virginia.

An appropriate order will be entered.

DATED:     This  19th day of September 2011.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE